Freeman vs. Freeman.

FREEMAN VS. FREEMAN.

DIVORCE. (1) *Adultery, how pleaded.* (2-4) *How proved.* (5-7) *What cruelty a sufficient cause for a divorce.* (8) *Suit money.*

1. The charge of adultery, as a ground for divorce, must specify one or more particular acts, and the evidence must be of facts bearing upon such specific charge.

2. Such a charge imputes a *crime;* and the fact of *actual* adultery, although in general it can be established only by circumstantial evidence, must be proved affirmatively beyond a reasonable doubt; and a mere preponderance of evidence is not sufficient.

3. While no absolute rule can be laid down as to the facts and circumstances from which adultery will be inferred, yet, in general, proof of *opportunity*, or the facility of access of the parties charged, will be insufficient, unless accompanied by some proof of the existence of an adulterous disposition in such parties.

4. Where there was some evidence of the existence of opportunities for the commission of adultery by the parties charged, but none of any unlawful attachment or intimacy, of any secret correspondence or stolen interviews, of any passionate declarations made or feelings exhibited; none that they were ever discovered in any indelicate or equivocal attitude or situation; and none that either of them was already depraved, corrupt in morals, or of vicious habits, or loose behavior; but the evidence, on the contrary, showed that they were of good repute and unexceptionable conduct both before and after the time laid in such charge: *Held*, that there was no sufficient evidence to sustain the charge.

5. No absolute definition can be given of the *cruelty* which will authorize the dissolution of the marriage relation. *Johnson v. Johnson,* 4 Wis., 135, criticized *per* DIXON, C. J.

6. *It seems* that personal violence, whether actual or threatened, or even gross and abusive language, is not absolutely necessary to constitute such cruelty, especially under our statute (R. S., ch. 111, sec. 9, subd. 5), which authorizes a divorce from the bond of matrimony "when the treatment of the wife by the husband has been cruel and inhuman, whether practiced by using personal violence *or by any other means.*"

7. The proof in this case showing, on the part of the husband, not only coarse and abusive language and epithets, often repeated, but actual personal violence and bodily harm inflicted upon the wife, with threats at one time of taking her life, a divorce from the bond of matrimony should be adjudged in her favor.

8. On reversing a judgment of divorce in defendant's favor, and awarding a divorce in favor of the plaintiff (the wife), this court denies a motion made here for an order requiring defendant to pay suit money and defray the expense of preparing and presenting the case here, in view of the facts that defendant will have the usual costs to pay in this court and at the circuit, and will be subject to a judgment in the circuit court in respect to alimony, and the further facts that he has but little property, has married again since the decree in his favor at the circuit (and before appeal taken), and will be unable to comply with the order asked for without distressing himself and his present family.

APPEAL from the Circuit Court for *Vernon* County.

Action by a wife for a divorce, on the ground of cruel and inhuman treatment. The defendant recriminates, charging the plaintiff with having committed the crime of adultery, at a house known as the Hosmer House, between the 1st of April and the 30th of June, 1863, with one Hill.

The evidence for the plaintiff tended to prove that the defendant was habitually unkind in his treatment of her, and guilty of much ill usage, abusive language and violent threats, and of at least one act of personal violence towards her, causing her to go away and leave him several times, and finally, through fear that her life was in danger, to refuse to return to him.

The evidence for the defendant tended to disprove the charge of ill treatment and violence to the extent complained of, and to show that the plaintiff left the defendant for other reasons and against his will; and that once they separated by agreement, and divided his personal property between them. There was evidence that, in the fall of 1862, Mr. Hill was holding protracted meetings at a school house in the neighborhood, and that he several times stayed over night at defendant's house, when he was absent; and that, in the spring of 1863, when Hill and his family were boarding at the Hosmer House, and the plaintiff was working there, he several times in the morning went down stairs from his rooms and entered the par-

lor, which the witnesses supposed the plaintiff occupied as a sleeping room, and remained ten or fifteen minutes, and then proceeded to his kitchen and built his fire, taking no special precaution to avoid noise or conceal his movements.    Testimony was also admitted, against plaintiff's objection, tending to show that a clandestine meeting took place at the schoolhouse after one of the meetings held by Hill, between parties whom the witness did not see, but believed from circumstances to be the plaintiff and Hill, and that the crime of adultery was committed there.    No more direct or positive proof of the guilt of the plaintiff was produced, but all the testimony tending to establish it was positively denied by the plaintiff and by Hill, under oath; and their testimony was in some points supported by the other rebutting evidence.

A jury having been waived, the action was tried by the court, which found all the issues in favor of the defendant, and granted him a judgment of divorce on the ground of adultery.

The plaintiff appealed.

*Carpenter & Chase,* for appellant, argued that it was not essential, under subd. 5, sec. 9, chap. 111, R. S., that cruelty and inhumanity should consist of personal *beating and castigation* (4 Barb., 217; 10 Iowa, 133; 13 id., 266; 7 N. H., 196; 30 Ala., 714; 4 Eng. (Ark.), 507; 1 Green Ch., 459; 11 Harris, 156; 1 Bishop M. & D., § 725); that cruelty which affects the life, health, or even the comfort of the person aggrieved, and gives a reasonable apprehension of bodily harm is sufficient, under sec. 11 of the same chapter, to warrant a divorce, and it need not be persistent (1 Bouv. Law Dic.; 19 Cal., 626; 4 Mass., 587; 1 Bishop M. & D., §§ 720, 725, 729, and notes; 4 Eng. Ec., 310, 311; Hagg. Cons., 35; Milward, 159); that evidence of personal violence having been given, proof of other conduct, designed merely to perplex and annoy, is admissible (7 Texas, 538, and authorities above cited); and that *indignities* offered to the wife may be more cruel than blows, and be sufficient to warrant a divorce.    4 Barb., 220; 11 Ala., 620; 10

Jur., 143, 144; 14 Texas, 356; id., 79, 84. In this case there is proof of cruelty, of threats, and of personal violence. 2. The admission of evidence to prove an act of adultery, at any time or place other than as charged in the answer, was error. 6 Johns. Ch., 347; 13 Jur., 90–95; 4 Wis., 135; 20 N. H., 299–301; 2 Bishop M. & D., §§ 278, 605–607; 1 Greenl. Ev., §§ 51, 52. The testimony on that subject is contradicted and im-peached.

*T. C. Ankeny* and *C. M. Butt* (with *S. U. Pinney*, of counsel), for respondent:

An action by a wife for a divorce on the ground of cruelty may be defeated by setting up as a defense and proving adultery on her part (*Watkyns v. Watkyns*, 2 Atk., 96; *Holmes v. Holmes*, Walk. (Miss.), 474; *Johns v. Johns*, 29 Ga., 718; *Bedell v. Bedell*, 1 Johns. Ch., 604; *Smith v. Smith*, 4 Paige, 92; 2 Bishop M. and D., § 78); especially when it was committed prior to the alleged acts of cruelty. 2. It was competent for the court to grant the defendant affirmative relief, the plaintiff having taken issue upon the adultery, and consented, by not objecting, to the trial thereof. *Peck v. School Dist.*, 21 Wis., 516. 3. There was sufficient proof of that charge. 2 Bishop on M. and D., §§ 613, 619, 621, 623, 625. 4. Cruelty, to be sufficient ground for a divorce, must be such as to cause a reasonable apprehension that continuing to cohabit would be attended with bodily harm to the party seeking relief; and it must be unmerited and unprovoked. Bishop M. and D., 717 et seq.; *Johnson v. Johnson*, 4 Wis., 135; *Skinner v. Skinner*, 5 id., 449.

DIXON, C J. "A bill for divorce upon a charge of adultery, should not," says the chancellor, in *Miller v. Miller*, 20 N. J. Eq. R. (5 C. E. Green), 217, "be filed upon general suspicion, nor until the discovery of some specific act, or of the facts from which such act must be inferred, and these should be sufficiently stated to identify the act upon which the suit is

founded." It is not objected that the adultery charged by the answer to have been committed at the house known as the Hosmer House, in the village of Desoto, is not sufficiently stated to identify the act upon which the defendant recriminates and claims a divorce on his part; but it is insisted, as the adultery so charged to have been committed is the only act of which the defendant complains or which is specified in his answer, that proof of other acts, or testimony tending to show them, or from which it is claimed they might be inferred, committed at other times and places, was wholly inadmissible upon the trial. This objection is urged with reference to the testimony which was received respecting the supposed clandestine meeting at the Bishop school house; and it was no doubt clearly contrary to rule that such testimony was admitted. The offense charged is a most grave and serious one, for which no person can be required to answer except upon distinct and positive specification, to which the proofs must be strictly confined; for otherwise the party cannot come prepared to defend, and the greatest injustice and wrong might be committed. But, in this case, the charge of adultery made against the plaintiff, as well that alleged to have been committed at the Hosmer House, which was sufficiently pleaded, as that which was attempted to be shown elsewhere, appears to this court to have been entirely unfounded, and to have been brought forward without the discovery or proof of any facts sufficient to justify a general suspicion, or even a well-grounded suspicion of any kind, of its truth. Such was the clear and strong impression of this court after having attentively listened to the reading of the testimony at the bar, and subsequent careful examination has but strengthened and confirmed that impression.

The kind of evidence requisite to sustain the charge of adultery in cases of this nature, is thus stated by the court in *Berckmans v. Berckmans*, 17 N. J. Eq. R. (2 C. E. Green), 454: "The charge made by the complainant, if true, is known to our law as a crime; consequently this prosecution partakes strongly of

the nature of a criminal proceeding, so much so as to place the complainant under the necessity, not only of placing a decided preponderance of testimony in favor of the charge, but of *proving* it to the satisfaction of the court beyond a reasonable doubt. I do not mean to say that it must be done by such an amount of overwhelming and unmistakable evidence as to render it impossible to be otherwise; but the evidence must be such as to satisfy the human mind, and leave the careful and guarded judgment of the court free from any conscientious and perplexing doubts as to whether the charge be proved or not. If, after a careful examination of all the competent testimony, such doubts remain immovable, it is clearly our duty to give the defendant the benefit of such doubts, and to refuse the prayer of the complainant."

Now, while it is undoubtedly true, as stated by Mr. Bishop, in the passage cited by counsel (Mar. & Div., § 613), that adultery is peculiarly a crime of darkness and secrecy; that parties are rarely surprised in it, and so it not only may, but ordinarily must be established by circumstantial evidence; yet, as the author observes in the very next sentence, the testimony must convince the judicial mind *affirmatively* that actual adultery was committed, since nothing short of the carnal act can lay the foundation for a divorce. And further on, in § 644, the same author gives his assent in the most unqualified way to the proposition that the fact of adultery, although in general to be established only by proof of other facts and circumstances, must be proved beyond a reasonable doubt. He says: "The principle which best commends itself to reason and modern authority is, that the rules of evidence are the same in civil and criminal causes, when the *issue*, which is the test, is the same." It is true of almost all acts of a criminal nature, that they are perpetrated in darkness and in secret, and must in general be proved by circumstantial evidence; and yet it is a principle of universal application, or nearly so, that the degree of proof necessary to establish them is the same in both civil and crimi-

nal cases.  See *Pryce v. The Security Ins. Co.*, 29 Wis., 270, and cases there cited.

And such, in effect, we regard the rule laid down by Lord STOWELL upon the subject, and which has been so often quoted in the books.  He says: "It is a fundamental rule, that it is not necessary to prove the direct fact of adultery, because, if it were otherwise, there is not one case in a hundred in which that proof would be attainable: it is very rarely indeed that parties are surprised in the direct fact of adultery.  In every case, almost, the fact is inferred from circumstances that lead to it by fair inference *as a necessary conclusion;* and unless this were the case, and unless this were so held, no protection whatever could be given to marital rights.  What are the circumstances which lead to such a conclusion cannot be laid down universally, though many of them, of a more obvious nature and of more frequent occurrence, are to be found in the ancient books: at the same time it is impossible to indicate them universally; because they may be infinitely diversified by the situation and character of the parties, by the state of general manners, and by many other incidental circumstances, apparently slight and delicate in themselves, but which may have most important bearings in decisions upon the particular case. The only general rule that can be laid down upon the subject is, *that the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion;* for it is not to lead a harsh and intemperate judgment moving upon appearances that are *equally capable of two interpretations;* neither is it to be a matter of artificial reasoning, judging upon such things differently from what would strike the *careful and cautious consideration of a discreet man.*  The facts are not of a technical nature; they are facts determinable upon common grounds of reason; and courts of justice would wander very much from their proper office of giving protection to the rights of mankind, if they thought themselves loose to subtleties, and remote and artificial reasonings, upon such subjects.

Upon such subjects the rational and legal interpretation must be the same." *Loveden v. Loveden*, 4 Eng. Ec. R., 461.

Now, what struck the mind of this court at the first reading of this testimony, and what still remains as a deliberate and carefully formed conviction, is the utter absence of anything like proof of an adulterous intent, or disposition, on the part of either of the parties accused, to commit the offense charged, time and opportunity for that purpose being first shown to have been afforded to them.   If we strike out from the case the tes- timony of the witness Berger as to the supposed meeting of the parties at the school house, which was improperly admitted, and which, if it had been properly so, proved nothing, since the witness did not pretend to have seen nor in any manner to identify either of the parties; and if we omit also a single remark shown to have been made by the plaintiff expressive of her love for Mr. Hill, and which is susceptible of an entirely different inter- pretation from that given to it by counsel for the defendant, and was doubtless so intended — there seems to be a total absence of any of those facts and circumstances usually relied upon by courts of justice, and evidence of which is always required in order to establish the adulterous disposition.   "Every act of adultery, " says Mr. Bishop (§ 619), " implies three things: first, the opportunity; second, the disposition in the mind of the adulterer; thirdly, the same in the mind of the *particeps crim- inis.*  And the proposition is substantially true, that, whenever these three are found to concur, the criminal fact is committed. " In the present case, the most that can be said to have been proven, and that not upon testimony of the most satisfactory character, was the opportunity; and from that alone the court is asked to infer and adjudge the guilt of the parties.   It is easy to see that upon such testimony there is scarcely a man or woman in the entire community who might not be convicted of the offense.   After having first observed the impossibility of laying down beforehand, in the form of a rule, what circum- stances shall, and what shall not, constitute satisfactory proof

Freeman vs. Freeman.

of the fact of adultery, because the same facts may constitute such proof or not, as they are modified and influenced by different circumstances, Chief Justice SHAW proceeds to notice some and the most usual of these circumstances, as follows: "Suppose, for instance, a married woman had been shown, by undoubted proof, to have been in an equivocal situation with a man not her husband, leading to a suspicion of the fact. If it were proved that she had previously shown an unwarrantable predilection for that man; if they had been detected in clandestine correspondence, had sought stolen interviews, made passionate declarations; if her affection for her husband had been alienated; if it were shown that the mind and heart were already depraved, and nothing remained wanting but an opportunity to consummate the guilty purpose — then proof that such opportunity had occurred would lead to the satisfactory conclusion that the act had been committed. But when these circumstances are wanting; when there has been no previous unwarrantable or indecent intimacy between the parties; no clandestine correspondence, or stolen and secret interviews; the fact of opportunity and equivocal appearances would hardly raise a passing cloud of suspicion over the fair fame of such a woman." *Dunham v. Dunham*, 6 Law Reporter, 141; Bishop, § 616. "This is a species of evidence," says Dr. LUSHINGTON, in *Dillon v. Dillon*, 7 Eng. Ec. R., 383, "the court always looks for, indeed, requires, wherever the circumstances admit of its production, as was frequently observed by Lord STOWELL." And in *Harris v. Harris*, 4 Eng. Ec. R., 162, the same eminent jurist says: "Now, if there was the slightest proof of any indecent familiarity between the parties, or if the court was in any way satisfied that undue intimacy subsisted between them, then the court would travel much more easily to the conclusion, that where the facilities were so great, and the opportunity of access so easy, the crime of adultery might have been committed; there is not the least proof, however, of any indecent familiarity, nor improper intimacy, between the parties,

nor of any conduct approaching towards it, and I cannot come to the conclusion that they did commit the crime of adultery," etc. And again, in the same case, p. 164, he says: "In support of this view of the case, it has been said, that there was great facility of access, and I think it so proved; but then this facility of access was not purposely made; it is incidental to the state of the ship; and it is quite evident that, on board a vessel, difficulty of access, even when desired, can seldom be effected. If it appeared, however, that any undue familiarity was observed between the parties, or that any improper attentions were paid by Captain Harris to this lady, during the voyage to England, the court could then find less difficulty in coming to the conclusion, that, where access was so easy, the parties had availed themselves of the opportunities thus afforded. Upon looking at the evidence, however, the court sees no one fact or circumstance which could justify it in drawing such a conclusion. The behavior of the parties in public seems to have been perfectly proper, and quite unexceptionable; for no circumstance is stated tending to throw the slightest suspicion on any part of their conduct during the voyage. It is impossible that, because it is in evidence that this lady was a pretty woman, or a vain woman, the court should suppose that she was criminal, or that it should impute to Captain Harris, without further evidence, the crime that has been charged against him." And in *Williams v. Williams*, 4 Eng. Ec. R., 415, Lord STOWELL says: "I take the rule to be, that there must be such proximate circumstances proved, as, by former decisions, or on their own nature and tendency, satisfy the legal conviction of the court that the criminal act has been committed."

The foregoing extracts have been made, not alone because of their applicability to the circumstances of the case before us, but also because they express the views of some of the ablest and most experienced courts and judges upon the difficult question under consideration. And if one would know with what care and solicitude such questions are always examined, how

testimony, apparently sufficient, is sifted, scrutinized and often rejected, how the character, motives, intelligence, memory and credibility of witnesses are canvassed, and how every circumstance is weighed and considered, in order that no reasonable doubt of guilt may remain, if that is to be the judgment, he has only to study the cases above referred to, and, besides those, the following: *Adams v. Adams*, 17 N. J. Eq. R. (2 C. E. Green), 324; *Jones v. Jones*, id., 351; *Reid v. Reid*, id., 101; *Bray v. Bray*, 2 Halst. Ch., 506; *Larrison v. Larrison*, 20 N. J. Eq. (5 C. E. Green), 100; *Flavell v. Flavell*, id., 211; *Alexander v. Alexander*, 2 Swab. & T., 95; *Chambers v. Chambers*, 4 Eng. Ec. R., 445.

Now it cannot be necessary for us here to recapitulate the testimony to show what it does not contain, or that there is no evidence of any such facts and circumstances as are above spoken of, or of any others intrinsically and of their own force tending to show the criminal disposition of either of the parties, unless it might possibly be said that the unhappy relations and troubles which sometimes existed between the plaintiff and her husband are some evidence to be considered for that purpose. There is no evidence of any unlawful attachment or intimacy, nor of any improper or unbecoming conduct — none of any secret correspondence or stolen interviews, nor of any passionate declarations made or feelings exhibited — none that the parties charged were ever discovered in any indelicate or equivocal attitude or situation — and none that either of them was already depraved, corrupt in morals, or of vicious habits or loose behavior or character. On the contrary, the facts, so far as they are disclosed by the case, were the very reverse, and such as to repel and rebut any inference of crime arising from the mere fact of opportunities having been afforded for the commission of it. Such opportunities were at most but few, and many of those occurred very soon after the parties first became acquainted, and when it is hardly possible to conceive that anything like a criminal intimacy or intercourse had sprung up between them,

or that any plan could have been laid or arrangements made for carrying on such intercourse. The opportunities which the parties did have, or the times and places when we find them to have been together, are all most satisfactorily explained and accounted for, consistently with the supposition of entire innocence on their part. Such were the circumstances of the alleged paramour remaining over night at the house of the defendant at the several times while religious meetings were being held in the Bishop neighborhood. The plaintiff was a member of the church of which he was a minister; and, if we mistake not, the evidence also shows that the defendant was or became such member. The plaintiff was an attendant, and the defendant sometimes, upon the religious meetings; and the minister, on several occasions, as he was accustomed to do at the houses of other attendants and members, received lodgings for the night at her house. The existence of this custom and mode of entertainment is fully established; from which it must certainly follow that nothing prejudicial to the character of the plaintiff can be inferred from the circumstance of her having so received and entertained him. The fact also appears that at all such times there were several other persons *constantly* in the house. And of the other circumstances connected with the meetings of these parties as shown by the testimony, if we take, for example, the visit of the plaintiff to the family of Mr. Hill while residing in the Hosmer House in the spring of 1863, none are more suspicious or less consistent with innocence than those already spoken of. All are fairly and fully explained, and shown to have been incidental to some other object or design, and not to have been brought about for the purpose or with a view of perpetrating the offense with which the plaintiff is charged. And in this connection the court cannot forbear to remark, that the character of a minister of the gospel, whose reputation in all respects, except so far as it may have become involved by the unfortunate matter in controversy, appears to be fair, goes a great way to explain the facts, if indeed any explanation of them

can be thought to be necessary. Nor can the court refrain from the observation, that the good character which the plaintiff appears generally to have borne, both before and since the time the offense is alleged to have been committed, is a most significant circumstance in her favor. If found guilty, the court would be required to believe that from a life of virtue and fidelity she turned suddenly to one of depravity and vice, and then as suddenly again returned to her former virtuous ways. Such a circumstance is highly improbable, and seldom or never occurs. There is not a scintilla of proof of prior misconduct or conjugal infidelity, and her subsequent behavior appears to have been innocent, and not the subject of the slightest suspicion. It was suggested by Lord STOWELL, in *Williams v. Williams*, *supra*, as possibly a "less laudable motive" for instituting the proceeding, that it might have been for the purpose " of trying the experiment of how little proof will be accepted as sufficient" to sustain the charge of adultery. A similar remark might, and with greater propriety, perhaps, be ventured here, that the bringing forward of this charge more than seven years after the occurrence is alleged to have taken place, and during all which time the husband seems to have had no thought of the infidelity of the wife, was to try the experiment of how little proof will be accepted as sufficient to raise a suspicion of her infidelity.

Counsel for the plaintiff criticize with considerable severity the character and conduct of some of the defendant's witnesses; and this may not, perhaps, be without some ground. We are not required, however, to advert to those points, since, conceding the witnesses to be truthful, and all that they say to be proved, still sufficient is not shown to establish the guilt of the plaintiff. The testimony of the witness French is fully obviated, and all effect from it lost, by the fact, so clearly and satisfactorily established by the witnesses for the plaintiff, that she was not in the parlor when that witness testifies to Mr. Hill's having entered it. The same observation is applicable to a considerable part of the testimony of the witnesses Mr. and

Mrs. Trott. The coincidence in the statements of these wit-
nesses in respect to the measurement of time and in some other
particulars, may, as counsel say, be some evidence of combina-
tion on their part to injure the plaintiff and Mr. Hill. "To
those who know, from experience and reflection, the laws
which regulate the human memory," say the court in *Adams
v. Adams, supra*, "it does not seem singular that several per-
sons, in speaking of a past transaction, do not each reproduce
it in description with the same fullness and detail; but such is
not the vulgar notion. Among the ignorant, the strongest
proof of the truth of testimony derived from several witnesses,
is the fact that the statements of each are nearly identical with
those of the others. Hence the exact similiarity which we so
often see in the depositions of corrupt witnesses, whose evidence
has been pre-arranged."

  It being thus seen that the adultery charged is not proved,
and that the judgment of the court below granting a divorce
upon the prayer of the defendant on that ground must be
reversed, the next point of inquiry is, whether good cause for
divorce is shown on the ground of cruelty charged by the
plaintiff in her complaint. As to what is cruelty which, for
this purpose, shall be deemed sufficient to authorize a dissolu-
tion of the marriage relation, the courts have as constantly
refused to lay down a direct definition, as they have to define
and point out what the circumstances must be from which the
fact of adultery will be inferred, in the absence of direct and
positive evidence upon the subject. "This, however, must be
understood," says Lord STOWELL, in *Evans v. Evans*, 4 Eng.
Ec. R., 311, "that it is the duty of courts, and consequently
the inclination of courts, to keep the rule extremely strict.
The causes must be grave and weighty, and such as to show
an absolute impossibility that the duties of the married life can
be discharged. In a state of personal danger no duties can be
discharged; for the duty of self-preservation must take place
before the duties of marriage, which are secondary both in

commencement and in obligation ; but what falls short of this is with great caution to be admitted. &ast; &ast; &ast; *What merely wounds the feelings is in few cases to be admitted,* where they are not accompanied with bodily injury, either actual or *menaced.* Mere austerity of temper, petulance of manners, rudeness of language, want of civil attention and accommodation, even occasional sallies of passion, if they do not *threaten* bodily harm, do not amount to legal cruelty : they are high moral offenses in the marriage state undoubtedly, not innocent, surely, in any state of life, but still they are not that cruelty against which the law can relieve." It would seem from these remarks by one whose words ought to be law upon this subject, that there may be cases where what merely wounds the mental feelings, though unaccompanied with bodily injury either actual or menaced, will constitute that cruelty for which the law will afford relief. It would seem from the same remarks, also, that proof of actual bodily injury is not required, but that such injury threatened or menaced will under some circumstances suffice. And it appears to me, in reason and justice, that both propositions ought to be accepted as correct. Everybody knows that there may be a refinement of cruelty practiced on the part of one of the parties towards the other, unconnected with gross and abusive language or epithets or with anything personally violent or threatening, which may render the marriage state absolutely intolerable, and the discharge of the duties of married life an impossibility. Everybody knows that the conduct of the husband towards the wife may be such, even without any personal violence, actual or threatened, as to render her marriage state intolerable, and, from mere mental suffering and physical debility so produced, to make it utterly impossible for her to perform the duties which are expected of a wife, and which otherwise she would be able and anxious to perform. The language of the above quotation would seem to leave cases of this nature within the rule or definition of legal cruelty, as I must say I think they

ought to be; and it is for this reason I have always doubted the correctness of the decision in the early case in this court, of *Johnson v. Johnson*, 4 Wis., 135. With all due respect, I must confess I regard the rule as laid down there, or as applied to the facts of that case, which in my judgment were most aggravating and cruel, as unreasonably narrow and stringent; and I much prefer that indicated in the above language of Lord STOWELL. And this view would seem to be most in harmony with the true exposition and obvious intent of the statute, which declares that a divorce from the bond of matrimony may be adjudged " when the treatment of the wife by the husband had been cruel and inhuman, whether practiced by using personal violence *or by any other means.*" R. S., ch. 111, sec. 9, subd. 5; 2 Tay. Stats., 1271, § 9, subd. 5.

In the case now before us there is abundant proof, not only of coarse and abusive language and epithets, often repeated, but of actual personal violence and bodily harm, accompanied by threats at the time the plaintiff left his house, that he, the defendant, would take her life. The facts thus proved are fully as strong, if not stronger, to sustain the charge of cruel and inhuman treatment, than those shown in the case of *Pillar v. Pillar*, 22 Wis., 658, where this court sustained a judgment for divorce on the same ground. It is the opinion of this court, therefore, that judgment should have been rendered for the plaintiff, granting the divorce upon the ground of cruelty set forth in her complaint, and proved at the trial. And from this conclusion, we think, the defendant will not himself dissent, since it will relieve him from the awkward and somewhat uncomfortable dilemma of being at the same time the lawful husband of two wives. The court was informed by counsel at the argument, that, after judgment in the court below, and before appeal was taken to this court, he was again married to another woman.

A motion was made before this court for an order requiring the defendant to pay suit money, and to defray the expenses of

preparing and presenting the cause here. The preparation and printing of the case, which is quite voluminous (466 folios), has been attended with considerable expense, besides the fees of counsel; and very satisfactory grounds have been shown for making the order, provided it had not appeared that the defendant has but little property, and would be pecuniarily unable to comply with the order, if made, without distressing himself and the new wife whom it appears he has now to support. It would seem hardly just or proper, in a matter resting in discretion, to distress one family for the sake of supplying the wants of another. It appears, furthermore, that some money has been contributed towards these costs and expenses by some of the friends of the plaintiff. The judgment appealed from will be reversed with costs in this court against the defendant. In this way the defendant will be required to pay all costs of appeal, which will include the disbursements for printing the case and briefs, and twenty-five dollars to the attorneys for the plaintiff. The court below, on the cause being remanded, will likewise be required to give judgment for costs against him there, together with such further sum for alimony to the plaintiff, as, by the rules of law governing the subject, she may be entitled to. On the whole, therefore, it appears to the court that the motion should be denied, and that no allowance should be granted against the defendant for costs and expenses in this court beyond what he will thus necessarily be required to pay.

*By the Court.*— Judgment reversed, and cause remanded with directions to enter judgment in favor of the plaintiff, and against the defendant, according to the prayer of her complaint.